# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 40540**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Adrienne L. CLARK**
Master Sergeant (E-7), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 13 May 2025

————————————

*Military Judge*: Matthew D. Talcott (Article 30a, UCMJ, proceedings); Sterling C. Pendleton.

*Sentence*: Sentence adjudged 3 June 2023 by GCM convened at Royal Air Force Mildenhall, England. Sentence entered by military judge on 11 July 2023: Dishonorable discharge, confinement for 32 months, reduction to E-1, and a reprimand.

*For Appellant*: Major Heather M. Bruha, USAF; Bethany L. Payton-O'Brien, Esquire.

*For Appellee*: Colonel Matthew D. Talcott, USAF; Lieutenant Colonel J. Pete Ferrell, USAF; Lieutenant Colonel Jenny A. Liabenow, USAF; Lieutenant Colonel G. Matt Osborn, USAF; Mary Ellen Payne, Esquire.

Before RICHARDSON, MASON, and KEARLEY, *Appellate Military Judges*.

Senior Judge RICHARDSON delivered the opinion of the court, in which Judge MASON and Judge KEARLEY joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

RICHARDSON, Senior Judge:

A general court-martial composed of officer members convicted Appellant, contrary to her pleas, of one specification of sexual abuse of a child in violation of Article 120b, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920b, and one specification each of extramarital sexual conduct, indecent language, indecent conduct, unenumerated service-discrediting conduct, possession of child pornography, and distribution of child pornography in violation of Article 134, UCMJ, 10 U.S.C. § 934.[1,2] The military judge sentenced Appellant to a dishonorable discharge, confinement for a total of 32 months, reduction to the grade of E-1, and a reprimand. The convening authority took no action on the findings or sentence but provided the language for the reprimand.[3]

Appellant raises ten issues on appeal, which we have partly renumbered and rephrased, asserting: (1) the guilty findings to the specifications of Charge I are factually insufficient; (2) the guilty findings to Specification 1 of Charge I and the Specification of Charge II are legally insufficient; (3) the search of Appellant's email account violated her rights under the Fourth Amendment;[4] (4) the military judge abused his discretion when he denied Appellant's challenge to two court members; (5) the guilty findings to (a) Specification 3 of Charge I and the Specification of Charge II, and (b) Specifications 6 and 7 of Charge I were an unreasonable multiplication of charges; (6) the military judge abused his discretion in denying Appellant's motion to disqualify Government counsel and to limit the Government's expert's testimony due to the derivative use of immunized testimony; (7) relief is required to correct the staff judge advocate's indorsement to the entry of judgment that states a firearm prohibition was triggered;[5] (8) the military judge erred when he allowed the Government

---

[1] Unless otherwise noted, all references in this opinion to the UCMJ, Military Rules of Evidence (Mil. R. Evid.), and Rules for Courts-Martial are to the *Manual for Courts-Martial, United States* (2019 ed.).

[2] Appellant was acquitted of a second specification of indecent conduct (Specification 5 of Charge I).

[3] Additionally, the convening authority granted Appellant's requests to defer the reduction in grade and to waive automatic forfeitures, and denied her request to defer the automatic forfeitures. *See* Articles 57(b)(1) and 58b, UCMJ, 10 U.S.C. §§ 857(b)(1), 858b.

[4] U.S. Const. amend. IV.

[5] Appellant phrases this assignment of error as follows:

> 18 U.S.C. § 922 cannot constitutionally apply to [Appellant], who stands convicted of nonviolent offenses, where the Government cannot demonstrate that barring her possession of firearms is "consistent with the nation's historical tradition of firearm regulation."

to present evidence of bad acts committed by Master Sergeant (MSgt) Nathanial Casillas during the merits phase of Appellant's court-martial; (9) the Constitution gives Appellant a right to a unanimous guilty verdict; and (10) the military judge abused his discretion when he denied Appellant's Rule for Courts-Martial (R.C.M.) 917 motion to dismiss Specification 2 of Charge I.[6]

We have carefully considered issues (7), (8), (9), and (10) and find they do not require discussion or warrant relief. *See United States v. Guinn*, 81 M.J. 195, 204 (C.A.A.F. 2021) (citing *United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987)). We find merit in part of issue (6) but find no relief is warranted. We find merit in Appellant's challenges to Specifications 1 and 4 of Charge I; we set aside those findings of guilty and reassess the sentence. We affirm the remaining findings and the reassessed sentence.

## I. BACKGROUND[7]

Appellant and MSgt Casillas met in 2012. Although they were married to other people, they had a romantic relationship. Together they had a child, born in 2016.

In 2019, while assigned to different locations, Appellant and MSgt Casillas met up in person three times. The first time was in January in Thailand, and the second time was in April in Korea, where MSgt Casillas was assigned. The third time was in May in Virginia. During this third visit, they set up new email accounts. Appellant primarily used one account ("applejacks") and MSgt Casillas primarily used the other ("luckymango"). They opened these accounts to communicate privately with each other. Appellant used applejacks to save emails, images, and screen shots of her WhatsApp conversations with MSgt Casillas, often by sending emails to herself.

On 7 January 2020, 11 emails, each with between three and four attachments, were sent from applejacks to luckymango. They were all titled "Young girls" plus the number 1 through 11 consecutively. The email service provider (ESP) for the accounts flagged the attachments as child sexual abuse material (CSAM) and froze the applejacks account. At this time, Appellant was deployed from Italy to a foreign country.

---

[6] Appellant raises Issues (8)–(10) pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

[7] The transcript of Appellant's court-martial contains scores of errors. Quoted language in this opinion that is different from the transcript has been corrected after a review of the applicable audio recordings contained in the record of trial. We urge those involved in the recording, transcription, review, and certification of the record of trial to be more attentive.

Appellant called the ESP three times to complain that she could not access applejacks. The ESP recorded the calls. In the first call, Appellant said,

> I go to log on and it tells me that the account doesn't exist. I try to reset the password and it tells me that the account doesn't exist. I go to try and create a new account and then it says that the account exists but then it won't let me reset passwords or log on.
>
> . . . .
>
> And then just out of my own curiosity I went to like "create email" thing, and typed in that and it said that that email address already existed.

She stated the last time she was able to access the account was "earlier to— . . . probably, I don't know, six hours ago, maybe eight hours ago." She added, "And I'm in a foreign country . . . so I don't know if it got hacked or like what happened, but—" After the ESP representative told her he would place her on hold and to "stay on the line please," Appellant disconnected.

Appellant's second call to the ESP was about 17 hours later. Appellant said,

> My email was apparently hacked and I'm getting messages from other people that there's being porn distributed from that email, which is not in any way, shape, or form OK. I'm sitting in the middle of [a foreign country] and I'm certainly not doing that and I just want this account f**king shut down and I'll make a report with the local cops as well. If this is, I'm sorry, I'm a little freaked out at the moment, [laughs] this is not OK.
>
> . . . .
>
> Well, I started getting, I got a message from a friend of mine yesterday. I think it was yesterday, I don't know. I'm sorry, I was in bunkers all night, so I'm a little disoriented as far as days and times. Basically like freaking out on me, asking me why I sent such nasty things to him. And I was like, I have no f**king clue what you're talking about and I get on there, and sure enough, like it looks like I had sent porn and I assure you that did not happen and I don't know if my email got hacked, obviously it did or what has happened, but I want the account shut down like this is unacceptable.

Her response to the representative's question asking when she was last able to access the account was "I got in after I got the phone calls yelling at me, but I think it was a couple of days ago. . . . I don't remember exactly."

4

About 25 minutes later, Appellant called the ESP a third time, stating the previous call was disconnected. In this call, Appellant repeated that her account was hacked and she wanted it deleted. The representative told her she was sorry, she could not delete the account because "at the moment the account is inaccessible" due to "technical issues."

Appellant also told a co-worker in her deployed location that her email was hacked. No evidence was presented about whether Appellant had been in a bunker that night, or whether she made a police report. Also, no evidence was presented to corroborate her assertion to the ESP that others told her "porn" was sent from her account.

The ESP conducted an investigation. The investigator found that the IP addresses to which applejacks connected before, during, and after the CSAM was sent were consistent, indicating the use came from the same general location. The ESP notified the National Center for Missing and Exploited Children (NCMEC) via a cybertip of its concern regarding applejacks. NCMEC forwarded the case to the Air Force Office of Special Investigations (OSI), which opened an investigation. The initial investigation focused on MSgt Casillas and later was widened to include Appellant as a subject. Additional background regarding the investigations is in Section II.A, *infra.*

## II. DISCUSSION

### A. Search

Appellant asserts the military judge erred in denying in full the defense motion to suppress based on a violation of her rights under the Fourth Amendment. She argues that, despite the military judge's rulings, the plain view and good faith doctrines do not apply.[8] Moreover, she asserts the exclusionary rule should apply.

### 1. Additional Background

The ESP had subscriber information linking applejacks to MSgt Casillas. Also, one image from the applejacks account depicted an adult male in a United States Air Force uniform with the letters "CASILL" on the nametape visible. Special Agent (SA) EP from OSI initiated an investigation into MSgt Casillas. SA EP saw that 38 images were shared from applejacks to luckymango

---

[8] In her brief, in a subsection entitled "The Inevitable Discovery Doctrine and Good-Faith Doctrine Do Not Apply," Appellant notes "the Military Judge did not find that the inevitable discovery exception would apply." Accordingly, and because Appellant does not assert error, we do not discuss the inevitable discovery doctrine.

between 6 and 8 January 2020 with the subject titled "young girls." Most of these images appeared to be CSAM.

SA EP interviewed MSgt Casillas on 24 March 2020. MSgt Casillas explained that he and Appellant had started an affair in 2012. In 2019, Appellant and MSgt Casillas opened email accounts together—applejacks and luckymango—so they could communicate with each other discreetly. MSgt Casillas said applejacks was primarily for Appellant's use, and luckymango was for his use. SA EP focused his investigation of MSgt Casillas on allegations of possession and distribution of child pornography as well as adultery. OSI opened a second investigation with Appellant as subject.

A different OSI agent, SA MC, applied for a warrant to access email accounts, including applejacks and luckymango. From the information they had gathered thus far, OSI was unsure who used which accounts primarily, and who had access to each account. In his affidavit in support of the search authorization, SA MC stated, *inter alia*: "the [applejacks] email account itself is an instrumentality of the crime and the content of the emails is necessary to provide evidence of who the exclusive or primary user of the account is." A military judge found probable cause and issued the search authorization.

SA EP reviewed over 500 emails in applejacks, chronologically. He was looking for evidence of extra-marital sexual conduct between MSgt Casillas and Appellant, the identity of individuals who had access to the account, and evidence of possession and distribution of child pornography. SA EP found many applejacks emails which appeared to be from Appellant to MSgt Casillas, including an email from applejacks to luckymango dated 23 May 2019 that ended with "love Adrienne."

While looking through the emails for the identity of the account users and evidence of adultery and child-pornography offenses, SA EP saw several discussions of a sexual nature. SA EP did not pursue another search warrant; he believed the scope of the search authorization allowed him to search the emails, even though he was finding evidence of other crimes. These emails, including video attachments, formed the basis for several of the offenses charged under Article 134, UCMJ, alleging indecent or similar conduct.

The Defense filed a pretrial motion to suppress evidence "seized from [Appellant's] email account, applejacks . . . ." The Government opposed. The military judge held a hearing, where he took evidence and heard argument. In a written ruling dated 31 October 2022, the military judge granted the defense motion to suppress the fruits of the email search of the applejacks account pertaining to "evidence of indecent/lewd conduct and indecent language" and denied it as to evidence "pertaining to [child pornography] and extra-marital sexual conduct."

The Government filed for reconsideration, which the military judge granted. In a written ruling dated 4 November 2022, the military judge "deem[ed] it correct in law to change [his] prior ruling." He continued, "Thus, this Court finds that while evidence of indecent/lewd acts and indecent language was obviously *outside of the scope* of materials in the search authorization, SA [EP] was **searching *inside the scope* of the search authorization** when he discovered them—and that is the essence of 'plain view.'" In his analysis, he stated:

> Basically, there are two questions to be asked: (1) was SA [EP] lawfully at the location where he saw the evidence; and (2) was the contraband or incriminating nature of the evidence immediately apparent. Both questions are answered in the affirmative. When it was immediately apparent that certain email messages/video attachments he saw were evidence of improper activity, SA [EP] was authorized to seize them.

The military judge acknowledged the argument and "***best practice***" based on *United States v. Osorio*, 66 M.J. 632 (A.F. Ct. Crim. App. 2008), that the officer conducting the search should have stopped the search when finding matters outside the scope of the search authorization and obtained an additional search authorization. He continued: "However, ***to be clear,*** *upon reconsideration,* this Court finds: (1) *Osorio* cannot and did not abrogate the 'plain view' exception to the warrant requirement ([Mil. R. Evid.] 316(c)(5)(C)) and, (2) in this case, SA [EP] saw messages/videos that *he thought* were within the scope of the search authorization."

> The search authorization was not overbroad and SA [EP's] actions were reasonable under the circumstances. Furthermore, assuming *arguendo,* SA [EP's] review was improper, and he violated [Appellant's] Fourth Amendment rights—a conclusion the Court does not now draw—having had the opportunity to watch SA [EP] testify—and review his testimony again—the Court is satisfied ***SA* [*EP*] *did not act deliberately, recklessly, or with gross negligence,*** to deprive [Appellant] of her rights.
>
> . . . .
>
> SA [EP] objectively and reasonably relied on the military judge's probable cause determination. Thus, applying the facts, here, to the good faith exception, the Court concludes the search authorization was issued by competent authority—a military judge. SA [MC] could reasonably believe the military judge had a substantial basis for issuing the search authorization. . . . Finally,

> once the military judge authorized the search, OSI provided it to [the ESP], reasonably and in good faith.

The military judge considered and then rejected reasons not to apply the good faith exception: the military judge was not misled by the affiant and did not abandon his judicial role, and the warrant was not obviously lacking probable cause and was not unreasonable on its face.

Addressing the exclusionary rule, the military judge found:

> "Law enforcement actions trigger the harsh sanction of exclusion only when they are deliberate enough to yield 'meaningfu[l]' deterrence, and culpable enough to be 'worth the price paid by the justice system.'" The conduct of SA [EP] in this case was neither of these things. ***Once again***, while the ***better practice*** would have been for SA [EP] to seek legal advice and obtain an expanded search authorization, ***he did not act with the degree of recklessness or gross negligence to deprive [Appellant] of her rights or that would trigger the exclusionary rule***. If any wrong was done to [Appellant's] rights, it was not by design. He acted reasonably given the nature of digital evidence and the realties faced when attempting to search and analyze numerous emails and attachments. Simply put, SA [EP] acted in a way he believed was legally permissible. Finally, this case does not involve any recurring or systemic negligence on the part of law enforcement.

(Footnote omitted) (quoting *Davis v. United States*, 564 U.S. 229, 239 (2011)). Ultimately, the military judge found "[a]ll evidence obtained in SA [EP's] search and seizure of the applejacks email account was obtained lawfully and is admissible, subject to other evidentiary rulings."

**2. Law**

**a. Unlawful Searches and Standard of Review**

Evidence obtained as a result of an unlawful search is inadmissible against the accused if: (1) the accused makes a timely objection; (2) the accused has an adequate interest, such as a reasonable expectation of privacy, in the person, place, or property searched; and (3) exclusion of such evidence "results in appreciable deterrence of future unlawful searches . . . and the benefits of such deterrence outweigh the costs to the justice system." Mil. R. Evid. 311(a)(1)–(3). "Under [Mil. R. Evid]. 311(a), evidence seized pursuant to a search warrant issued without probable cause must be excluded unless an exception applies." *United States v. Hernandez*, 81 M.J. 432, 440 (C.A.A.F. 2021) (citation omitted).

A military judge's ruling on a motion to suppress evidence is reviewed for an abuse of discretion, "viewing the evidence in the light most favorable to the party prevailing below." *United States v. Hoffmann*, 75 M.J. 120, 124 (C.A.A.F. 2016) (citation omitted). The military judge's findings of fact are reviewed for clear error while conclusions of law are reviewed de novo. *Id.* (citation omitted). "An abuse of discretion occurs when a military judge's decision is based on clearly erroneous findings of fact or incorrect conclusions of law." *Hernandez*, 81 M.J. at 437 (citing *United States v. Erickson*, 76 M.J. 231, 234 (C.A.A.F. 2017)). "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *United States v. Solomon*, 72 M.J. 176, 179 (C.A.A.F. 2013) (citation omitted).

### b. Plain View

"The 'plain-view doctrine' allows law enforcement officials conducting a lawful search to seize items in plain view . . . ." *United States v. Fogg*, 52 M.J. 144, 149 (C.A.A.F. 1999) (citations omitted).

> [I]n order for the plain view exception to apply: (1) the officer must not violate the Fourth Amendment in arriving at the spot from which the incriminating materials can be plainly viewed; (2) the incriminating character of the materials must be immediately apparent; and (3) the officer must have lawful access to the object itself.

*United States v. Richards*, 76 M.J. 365, 371 (C.A.A.F. 2017) (citing *Horton v. California*, 496 U.S. 128, 136–37 (1990)).

The plain view doctrine "may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges." *Arizona v. Hicks*, 480 U.S. 321, 328 (1987) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 466 (1971)).

"'[M]erely inspecting' items that come into view while conducting a lawful search for other items produces 'no additional invasion' of an individual's privacy interests." *United States v. Shields*, 83 M.J. 226, 231 (C.A.A.F. 2023) (quoting *Hicks*, 480 U.S. at 325). "But on the other hand, 'taking action, unrelated to the objectives of the authorized intrusion, which expose[ ] to view concealed [items]' invades privacy protected by the Fourth Amendment." *Id.* (alterations in original).

### c. Good Faith

"Under the 'good faith' exception to the exclusionary rule, evidence obtained pursuant to a search warrant that was ultimately found to be invalid should not be suppressed if it was gathered by law enforcement officials acting in

reasonable reliance on a warrant issued by a neutral and detached magistrate." *Hernandez*, 81 M.J. at 440 (citing *United States v. Leon*, 468 U.S. 897, 918 (1984)). For the good faith exception to apply, the Government must establish that law enforcement's reliance on a defective search authorization is "objectively reasonable." *Hoffmann*, 75 M.J. at 127 (citation omitted). The Government has the burden of establishing by a preponderance of the evidence the following: (1) the seizure resulted from a search and seizure authorization issued, in relevant part, by a competent search authority; (2) the search authority had a substantial basis for determining probable cause existed; and (3) law enforcement officials reasonably and with good faith relied on the authorization. *See* Mil. R. Evid. 311(c)(3)(A)–(C), (d)(5)(A); *Hernandez*, 81 M.J. at 440; *United States v. Nieto*, 76 M.J. 101, 107 (C.A.A.F. 2017) (citing *United States v. Carter*, 54 M.J. 414, 420 (C.A.A.F. 2001)) (additional citation omitted).

The requirement in Mil. R. Evid. 311(c)(3)(B) for "substantial basis" is met if the person executing the search "had an objectively reasonable belief that the magistrate had a substantial basis for determining the existence of probable cause, even if the magistrate did not have such basis." *United States v. Perkins*, 78 M.J. 381, 388 (C.A.A.F. 2019). The question is "'whether a reasonably well trained officer would have known that the search was illegal' in light of 'all of the circumstances.'" *Herring v. United States*, 555 U.S. 135, 145 (2009) (quoting *Leon*, 468 U.S. at 922 n.23); *see United States v. White*, 80 M.J. 322, 328 n.7 (C.A.A.F. 2020).

The United States Supreme Court has identified four circumstances in which the "good faith exception" will not apply: (1) where the magistrate "was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth;" (2) where the magistrate "wholly abandoned his judicial role;" (3) where the warrant was based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;" and (4) where the warrant is so "facially deficient . . . that the executing officers cannot reasonably presume it to be valid." *Leon*, 468 U.S. at 923 (citations omitted). The United States Court of Appeals for the Armed Forces (CAAF) has harmonized these four exceptions with the three requirements under Mil. R. Evid. 311(c)(3) in finding *Leon*'s first and third exceptions incorporated in the second prong of Mil. R. Evid. 311(c)(3) (magistrate having a substantial basis) and *Leon*'s second and fourth exceptions incorporated in the third prong of Mil. R. Evid. 311(c)(3) (good faith reliance on the search authorization). *Carter*, 54 M.J. at 421.

### d. Exclusionary Rule

Evidence obtained in violation of the Fourth Amendment may be excluded at trial. *See United States v. Lattin*, 83 M.J. 192, 197 (C.A.A.F. 2023) (first citing *Arizona v. Evans*, 514 U.S. 1, 10 (1995); then citing *Weeks v. United*

*States*, 232 U.S. 383, 398 (1914)). This exclusionary rule is codified in Mil. R. Evid. 311(a). *Id.*

"[T]he exclusionary rule does not apply if the Government *either proves* that 'the deterrence of future unlawful searches or seizures is not appreciable' *or proves* that 'such deterrence does not outweigh the costs to the justice system of excluding the evidence.'" *Id.* at 197.

The CAAF does "not review the military judge's determinations with respect to the appreciable deterrence test or balancing test merely for clear error." *Id.* at 198. Instead, "the question is whether the military judge's assessment of these matters was a 'clearly unreasonable' exercise of discretion." *Id.* (footnote omitted) (quoting *United States v. Rudometkin*, 82 M.J. 396, 401 (C.A.A.F. 2022)). The CAAF explained how it applied this standard in *Lattin*, ultimately finding no abuse of discretion in the military judge's denial of the appellant's motion to suppress evidence under Mil. R. Evid. 311(a):

> Regardless of whether we would agree with the military judge's balancing of the costs and benefits on de novo review, we cannot say that the military judge's decision was clearly unreasonable. The high costs of excluding the evidence are undisputed, and while exclusion of the evidence may produce some future deterrence, the degree of this future deterrence is subject to reasonable disagreement.

*Id.* at 199.

### 3. Analysis

The plain-view doctrine applies to the search in this case. SA EP had lawful access to the applejacks emails. Without a detour from his search of the emails for evidence of adultery and child pornography, SA EP saw evidence of indecent language and acts. We agree with the military judge's conclusion that "SA [EP] was searching inside the scope of the search authorization when he discovered [evidence of indecent and/or lewd acts]—and that is the essence of 'plain view.'" (Emphasis omitted).

We also agree with the military judge and find the good-faith doctrine applies to the search in this case. The military judge acting as the magistrate was a competent authority to issue the search authorization. SA EP "had an objectively reasonable belief that the magistrate had a substantial basis for determining the existence of probable cause, even if the magistrate did not have such basis." *Perkins*, 78 M.J. at 388. SA EP did not have reason to question the scope of the authorization, and reasonably relied upon it. We disagree with Appellant's contention that SA EP "knew that he was required to obtain a new search authorization upon finding evidence of offenses not contemplated by the scope of the existing one." We find SA EP knew he could flag evidence he found

in plain sight while searching within the scope of the search authorization, and only if he wanted to expand the scope of his search would he need an additional search authorization.

Finally, we find the military judge's conclusion—that the Government proved by a preponderance of the evidence that deterrence is not appreciable and such deterrence does not outweigh the costs of exclusion—to not be a "clearly unreasonable exercise of discretion." *Lattin*, 83 M.J. at 197 (internal quotation marks omitted). The military judge found SA EP could have pursued the "better practice" of "seek[ing] legal advice and obtain[ing] an expanded search authorization," but also found "he did not act with the degree of recklessness or gross negligence to deprive [Appellant] of her rights or that would trigger the exclusionary rule." (Emphasis and footnote omitted). Ultimately, the military judge found "SA [EP] acted in a way he believed was legally permissible" and "this case does not involve any recurring or systemic negligence on the part of law enforcement."

We find the military judge did not abuse his discretion when he denied Appellant's motion to suppress the search of the applejacks email account.

## B. Challenge for Cause

Appellant asserts the military judge abused his discretion in this case when he denied Appellant's challenges for cause against two court members. Specifically, Appellant asserts the military judge did not address implied bias sufficiently. Appellant asks us to "apply a *de novo* level of review to both challenges." We find no error.

### 1. Additional Background

In group voir dire, senior defense counsel asked the members about their interactions with legal staff. Lieutenant Colonel (Lt Col) RM and other members answered in the affirmative that, in their professional duties, they have worked closely with a prosecutor in this case as well as an attorney from the Royal Air Force (RAF) Mildenhall legal office, and that they had a personal friendship or relationship with someone in that legal office. In individual voir dire by the military judge, Lt Col RM explained he worked with one of the prosecutors, Major (Maj) RH, on a commander-directed investigation. He also explained he has worked with the staff judge advocate (SJA) at RAF Mildenhall professionally and interacted with him personally. The military judge asked Lt Col RM how those interactions might affect him as a member on this case:

> Q: You said you worked closely with Major [RH]. Anything about that experience, having worked closely with her, and your relationship with the [SJA], do you feel like that that would cause you to view them, view their side—the Government side, the Prosecution side—with a little more credibility than you would

perhaps the Defense side, because of your relationships, your working relationships, and your personal relationships with Major [RH] and [the SJA] or do you feel like you'd be, I guess more bias to that side?

A: No, sir.

Q: And why is that?

A: I think, you know, they're professionals. We were acting in a professional relationship there in terms of the both those cases; you know I would assume that both sides would have the same level of professionalism and expertise.

The district trial counsel asked, during group voir dire, "Do any of you have specialized knowledge of digital devices or applications such as cell phones, computers, email or messaging applications?" Lt Col RM and two other court members answered in the affirmative. In individual voir dire by the military judge, Lt Col RM said he is "aware of [digital] capabilities . . . we have with cell phones as well as metadata and other types of information that we can use on cell phones, at a higher, higher level than most people." Lt Col RM explained that when he got his master's degree in information systems and security ten years ago, "some of the things we looked at were mobile platforms and digital platforms in terms of how you secure things and, you know, what information is being sent." Upon questioning by senior defense counsel, he admitted he is "not the expert in this field. A lot has changed since [he has] looked at any of that stuff." He also agreed he would not, based on his "understanding and experience" from his background and degree, "feel the need or be compelled to explain to [the other members in the deliberation room] . . . how these things work . . . to try and provide clarity to what it is the members are understanding." Instead of explaining, he said he "would tell them to go back to the court." Lt Col RM agreed he would base his decisions on the evidence rather than his own personal experience, and believed he would give Appellant a full, fair, and impartial hearing.

Trial defense counsel challenged Lt Col RM for implied bias. The military judge nevertheless considered actual bias in addition to implied bias, and considered "the mandate to liberally grant defense challenges." He referenced the implied-bias standard that he articulated in his consideration of Appellant's previous challenge for cause against a different member that "applies equally here as well":

I'll say that implied bias is an objective test that considers the totality of the circumstances as viewed through the eyes of the public and focuses on the potential perception of appearance of fairness in the military justice system. Implied bias exists when

> most people in the same position as the challenged member, would be prejudiced, regardless of whether this particular person actually is prejudiced. The implied bias is an objective test. The observation of the member's demeanor may inform judgments about implied bias.

Specifically regarding the challenge to Lt Col RM, the military judge stated,

> The question comes down to with regard to implied bias would an objective public observer have substantial doubt about the fairness of the accused's court-martial panel, where a court room [sic] member remains on the panel, who in this case has worked with one of the trial counsel and is, I guess slightly more than professional acquaintances with the SJA. However, I've determined that implied bias does not exist here. And the reason for that is a couple of things.

The military judge described Lt Col RM's personal interactions with the SJA at a small base "understandable" and "a friendly relationship . . . doesn't rise to the level of implied bias." He found the SJA does not rate the prosecutor, a member of the Air National Guard, adding to his conclusion that "it would not rise to the level of implied bias." He also contrasted Lt Col RM's interactions with the SJA with a different court member against whom he granted Appellant's challenge.

In group voir dire, the senior defense counsel asked, "Have you, a family member or a close friend ever been negatively affected in some way by intimate partner infidelity?" Captain (Capt) JS and two other court members answered in the affirmative. In individual voir dire by the military judge, Capt JS elaborated. She was friends with a newly married couple, and discovered the husband was having an affair. She said because she "was stuck in the middle of it for a little while" it impacted her "a little bit, but obviously not as much as [the wife]." She did not recall this incident when she read the charges in this case, only when the panel was asked the question about infidelity. Upon questioning by senior defense counsel, she stated her friend has moved on from this marriage to a new relationship. She asserted she could be fair and impartial in Appellant's case.

Trial defense counsel challenged Capt JS, for both actual and implied bias. The military judge found "actual bias does not exist here," then stated, *inter alia*:

> With regard to implied bias, the question comes down to would an objective public observer have substantial doubt as to the fairness of the accused's court-martial panel, where a court member remains on the panel who in this case was friends with

both a military member who was being cheated on, and friends with the husband who was doing the cheating. The court finds that implied bias does not exist here because it was a situation in which this panel member, appeared to act not out of moral disdain for adultery, or extramarital or sexual conduct, but rather to protect her best friend from a spouse who was cheating on her a lot, as was her words.

Both Lt Col RM and Capt JS remained on the panel after the R.C.M. 912(f)(5) random assignment. The Defense exercised its peremptory challenge on a court member whom it had not challenged for cause. Both Lt Col RM and Capt JS remained on the panel throughout Appellant's court-martial.

**2. Law**

An accused has "the right to an impartial and unbiased panel." *United States v. Nash*, 71 M.J. 83, 88 (C.A.A.F. 2012) (citation omitted). A person detailed to a court-martial shall be excused whenever it appears he or she "[s]hould not sit as a member in the interest of having the court-martial free from substantial doubt as to legality, fairness, and impartiality." R.C.M. 912(f)(1)(N). "'Substantial doubt' exists where the presence of a member on the panel would cause the public to think 'that the accused received something less than a court of fair, impartial members,' injuring the public's perception of the fairness of the military justice system." *United States v. Commisso*, 76 M.J. 315, 323 (C.A.A.F. 2017) (citation omitted). "The burden of establishing that grounds for a challenge exist is upon the party making the challenge." R.C.M. 912(f)(3). Potential court-martial members are subject to challenges for cause under actual bias and implied bias theories. *United States v. Hennis*, 79 M.J. 370, 384 (C.A.A.F. 2020) (citation omitted).

In a challenge based on actual bias, the question is whether the member personally holds a bias "which will not yield to the military judge's instructions and the evidence presented at trial." *Nash*, 71 M.J. at 88 (citation omitted). Claims that a military judge erred with respect to challenges alleging actual bias are evaluated on the totality of the circumstances and reviewed for an abuse of discretion. *United States v. Keago*, 84 M.J. 367, 372 (C.A.A.F. 2024) (citation omitted).

Implied bias is measured by an objective standard. *United States v. Bagstad*, 68 M.J. 460, 462 (C.A.A.F. 2010) (citation omitted). "Implied bias exists when, 'regardless of an individual member's disclaimer of bias, most people in the same position would be prejudiced [that is, biased].'" *United States v. Briggs*, 64 M.J. 285, 286 (C.A.A.F. 2007) (alteration in original) (quoting *United States v. Napolitano*, 53 M.J. 162, 167 (C.A.A.F. 2000)). "The test for implied bias is 'whether the risk that the public will perceive that the accused received

something less than a court of fair, impartial members is too high.'" *Keago*, 84 M.J. at 372 (quoting *United States v. Woods*, 74 M.J. 238, 243–44 (C.A.A.F. 2015)). We assess implied bias based on the "totality of the factual circumstances," assuming the "hypothetical 'public'" is familiar with the military justice system. *Bagstad*, 68 M.J. at 462 (citations omitted).

The CAAF recently summarized the standard of review of a military judge's ruling on a claim of implied bias:

> We interpret our case law as dictating a sliding standard of appellate review for implied bias challenges that falls somewhere on a spectrum between de novo and abuse of discretion based on the specific facts of the case. A military judge who cites the correct law and explains his implied bias reasoning on the record will receive greater deference (closer to the abuse of discretion standard), while a military judge who fails to do so will receive less deference (closer to the de novo standard). Accordingly, the more reasoning military judges provide, the more deference they will receive.

*Keago*, 84 M.J. at 373 (citing *United States v. Rogers*, 75 M.J. 270, 273 (C.A.A.F. 2016)).

"The military judge is . . . mandated to err on the side of granting a challenge[; t]his is what is meant by the liberal grant mandate." *United States v. Peters*, 74 M.J. 31, 34 (citation omitted). That is, "if after weighing the arguments for the implied bias challenge the military judge finds it a close question, the challenge should be granted." *Id.* Military judges who squarely address the liberal grant mandate on the record are given greater deference on appeal than those who do not. *United States v. Clay*, 64 M.J. 274, 277 (C.A.A.F. 2007).

"[A] prior connection to a crime similar to the one being tried before the court-martial is not per se disqualifying to a member's service." *United States v. Terry*, 64 M.J. 295, 297 (C.A.A.F. 2007) (upholding military judge's determination of no actual or implied bias where a court member's wife had been sexually abused before they met and rarely discussed it).

### 3. Analysis

The more reasoning the military judge provided on the record regarding implied bias and the liberal-grant mandate, the more deference we give his denial of these challenges for cause. Here, the military judge articulated the correct law. However, he did not expressly explain why public perception would not be affected. Nor did he state whether these were close calls.

At the beginning of his analysis on the challenges to Lt Col RM and Capt JS, the military judge framed the issue the same: "would an objective

public observer have substantial doubt as [to] the fairness of the accused['s] court-martial panel." Regarding Capt JS, he explained that the member did not appear to act "out of moral disdain for adultery or extramarital sexual conduct," and concluded "implied bias does not exist here." Reviewing between abuse of discretion and *de novo*, we find Capt JS's continued participation on Appellant's court-martial did not risk the public perceiving Appellant "received something less than a court of fair, impartial members." *Woods*, 74 M.J. at 243–44.

Regarding Lt Col RM, we give the military judge slightly less deference. The military judge referenced Lt Col RM's "understandable" personal relationship with the SJA. Overall, however, his analysis focused on why Lt Col RM did not have actual bias when it should have focused on why those matters would not affect public perception. Reviewing closer to *de novo*, we come to the same conclusion regarding Lt Col RM's continued participation in Appellant's court-martial as we did with Capt JS.

Based on our review of the record, neither challenge for cause was a close call, and excusal was not required under the liberal-grant mandate.

## C. Immunized Statements

Appellant claims the military judge abused his discretion in denying her motion to disqualify trial counsel and to limit the government expert's testimony "due to the derivative use of immunized testimony." The issue stems from pretrial interviews the *Casillas* prosecution team had with Appellant after she was given immunity and before her own court-martial. The *Casillas* prosecution team asked her about a photo that was both on MSgt Casillas's phone and in an applejacks email. Afterwards, they asked the examiner of the digital media, Petty Officer First Class (PO1) IA, some questions. Thereafter, PO1 IA did some research and testing, and then changed his opinion about who had access to applejacks.

We find the military judge erred in allowing the Government to use a derivative of Appellant's immunized statement, but that no relief is warranted.

### 1. Additional Background

PO1 IA worked at Defense Cyber Crime Center (DC3/DFL) when he examined evidence gathered in OSI's *Casillas* investigation. In his report dated 24 June 2022, he stated that on 26 April 2022, an OSI investigator asked DC3/DFL to examine the seized iPhone XR "to see if the application WhatsApp was installed" and if the application had communications between MSgt Casillas and Appellant. PO1 IA found WhatsApp installed, and Appellant was listed as a contact. PO1 IA found "one picture of interest" ("report item 2") that "appears visually identical to a picture that was found in an email from [applejacks] . . . ." He then concluded that "While [applejacks] is believed to belong to

[Appellant], the presence of this picture would suggest that [MSgt Casillas] may have had access to the account."

Maj JL and Capt NL were part of the *Casillas* prosecution team. The *Casillas* prosecution team interviewed Appellant on 8 and 14 September 2022, in the weeks leading to the *Casillas* trial. In the first interview, prosecutors asked about the photo of interest. Appellant told prosecutors that MSgt Casillas had sent it to her through WhatsApp.[9] Around 16 September 2022, the Casillas prosecution team asked PO1 IA why a photo has a short .jpeg name and other times has a large string of characters. They also asked how WhatsApp processes photos. This difference in file names for the same photo was not flagged in PO1 IA's report. The prosecution team did not tell PO1 IA what prompted them to ask the questions. Appellant testified in MSgt Casillas's trial, which concluded before her own trial.

During Appellant's trial, and during the Government's direct examination, PO1 IA was recognized as an expert in the field of digital forensics examination. The Government questioned him about his report, which had been admitted into evidence without objection. After the trial counsel started to ask questions about the photo, the Defense asked for an Article 39(a), UCMJ, 10 U.S.C. § 839(a), hearing. During the hearing, the civilian defense counsel stated Appellant was interviewed about the photo and testified about it during the *Casillas* trial. He stated: "the information gained by the prosecution in . . . *United States v. Casillas* in the immunized interview has caused [PO1 IA] to do additional research, which now changes his opinion. Which is now being used against [Appellant] in her trial now." He continued: "[the] Defense believes the remedy is not to preclude [PO1 IA's] testimony just to preclude the portion of which would be affected by the immunized interview or the testimony."

The hearing into the Defense's claim that the Government used Appellant's immunized statements (*Kastigar*[10] hearing) continued the next morning. For this hearing only, a taint-free counsel was detailed to represent the Government. The Defense added to its requested remedy that the trial team be disqualified because they reviewed PO1 IA's testimony from the *Casillas* trial.

During the *Kastigar* hearing, the military judge questioned PO1 IA:

---

[9] Civilian defense counsel asserted—without correction—that Appellant testified at MSgt Casillas's court-martial that she sent herself the photo. The record is unclear whether she made this same statement to prosecutors during one of the pretrial interviews.

[10] *Kastigar v. United States*, 406 U.S. 441 (1972).

Q: Do you remember what [the *Casillas* prosecution team], or general, or specifically what they asked you to research regarding the, your opinion regarding the photograph?

A: So they did not ask about my opinion regarding photographs, just how does WhatsApp process images? And how, why do we see, also knowing how things work and how images are stored on devices whenever you take a picture. And emails, why do we see, sometimes we'll see that pattern. Sometimes we'll see just image that JPEG, other times we see this large string of characters. What is this large string of characters? And how, how is all this happening?

Q: Understood. But prior to, at least prior to 8 September 2022, you were never asked by the trial team to do additional research into this issue of WhatsApp or WhatsApp naming conventions. Is that correct?

A: Not I recall, no, sir.

Q: And it was based on, that research, so I understand, so the trial team asked you to conduct the research, you then conducted the additional research and that's what caused you to change your opinion?

A: Correct. So my opinion is that the file that was emailed is not IMG_, was that sent from this phone it was sent from a phone that had downloaded that picture view. Most likely WhatsApp.

Q: Tracking. I know your, but your opinion changed and just for the record, you were, Master Sergeant Casillas that trial was supposed to begin the week of, believe it was, it was 19 September, of the week of 19 September?

A: Correct.

PO1 IA explained to the military judge his changed conclusion:

A: So my original opinion is in the report, Sir, that because of seeing the same file in both locations is possible that Master Sergeant Casillas may have had access to the applejacks account. However, in September after doing some more research and some more testing, found that whenever an image is sent to WhatsApp, WhatsApp changes the file name and then we saw the same pattern for file name being sent in the email "he took his other kids snowboarding." So it was in the same format that WhatsApp provides not from the camera from the iPhone.

Later during the *Kastigar* hearing, PO1 IA testified that he knew Maj JL was "well versed in how technology works" and "tries to stay up to date on everything." He said Maj JL "wanted to understand why, when we normally see file names behave in one manner when the file is sent from a device why are we seeing a different way of this occurring."

During the *Kastigar* hearing, the Defense marked as appellate exhibits the grant of immunity to Appellant and emails identifying the dates of Appellant's interviews with the *Casillas* prosecution team. The Government marked two sworn statements from the *Casillas* prosecution team. In his sworn declaration, Maj JL makes no mention of asking PO1 IA anything about image names and emails, or how WhatsApp processes images. He generally stated that, "to [his] knowledge, neither [he] nor any member of the Casillas Prosecution Team disclosed any immunized statements by [Appellant]." In his sworn statement, Capt NL said, "At no time was PO1 [IA] directed to conduct additional searches based off statements of any pre-trial interview, to include that of [Appellant]."

Appellant's civilian defense counsel told the military judge

> The Defense would like to call [Appellant] for the limited purpose of this motion hearing to provide information regarding specifically that she was asked the question about the photo, I can proffer that. I know we've met, I believe we've met our initial burden, but if, that's a concern for the court, the Defense is prepared to call [Appellant] for limited purposes of the motion to testify solely that she was asked about the photographing in question, that's report item 2 of [PO1 IA's] report, and how that was sent. That was the Defense initial proffer we made Major [JL's] affidavit is silent on that. So if the court believes that that is required for court, I'm prepared to do that, if the court does not believe that's required then we've already met our burden then we certainly don't need to do that.
>
> . . . .
>
> That she was asked specifically in a pretrial interview from the trial team regarding the photo on report item 2 and how she received it and that [Appellant] provided information that she received it via WhatsApp from Master Sergeant Casillas . . . .

The military judge asked counsel about the Defense's proffer:

> MJ: Trial Counsel. Do you have any thoughts on that? I'm hesitant to have [Appellant] take the stand just because of the immunity issues, but I'll hear from you, if you have any thoughts on the issue.

Trial counsel (TC): Your Honor, ultimately, that's, Defense's position to make. I don't -- I think based on [PO1 IA's] testimony, the link that the Defense is asserting makes sense.

MJ: Would you, I guess adopt that as fact, would you agree to adopt that as fact?

TC: Whether the photo was sent through WhatsApp or whether that was based on a pretrial interview?

MJ: Based on a pretrial interview?

TC: No, I wouldn't adopt those facts.

MJ: Okay, alright, thank you. I think for now, I'll just take it as proffer.

Civilian Defense Counsel (CDC): Yes, Your Honor. . . . I think the issue, the court's issue isn't that, isn't that factual issue, that's one part, but it's the analysis of that that the court makes, but I understand Your Honor. If, but if the court accepts that as a proffer from Defense, then the Defense is satisfied.

MJ: No, I'll accept that as a proffer as an officer of the Court.

CDC: Yes, Sir.

MJ: I mean, what I could do is I could allow [Appellant] to testify but no, no cross examination.

CDC: I'd defer that to the court, if the court will accept my proffer, then we're satisfied, if the court accepts that proffer, the court is, the Defense is satisfied.

MJ: I'll accept it as a proffer.

CDC: Yes, sir.

MJ: Trial Counsel, are you prepared to argue?

In her argument, trial counsel proffered what the prosecutors in the *Casillas* case who wrote declarations would say about their conversation with Appellant: "[N]either of them had any specific recollection about [Appellant] discussing transmission of this photo over WhatsApp." Trial counsel added:

So ultimately the question comes down to whether or not [Appellant] stated to the trial counsel that that photo was sent via WhatsApp, and whether that was what prompted the additional scrutiny of the digital forensic evidence, and that's simply not supported by the evidence that the court has before it. I understand that the court does have a proffer from counsel, essentially

an assertion from [Appellant] herself that that was discussed. But . . . that's not consistent with the trial counsel's recollection of that interview.

In his ruling, the military judge found as fact:

[Appellant] was granted testimonial immunity in order to testify as [to] her knowledge of the offenses Master Sergeant Casillas committed. [Appellant] was granted immunity on 5 March 2021. [Appellant] participated in an immunized interview with trial counsel in the case of *United States v. Casillas* on 8 September 2022 and 14 September 2022. In those interviews, the *Casillas* prosecution team did not learn anything significant that they did not already know from the evidence that was previously discovered during the investigation. [Appellant] maintains she was asked about the photo contained in the report, item 2 of Prosecution Exhibit 13, specifically if she received the photo via WhatsApp.

Petty Officer First Class [IA] was a digital forensic examiner in the case of *U.S. v. Casillas*, and in the case of *United States v. Clark*, he completed a DC3 laboratory report dated 24 June 2022.

. . . .

Petty Officer First Class [IA] was walled off from all aspects relating to anything that *Casillas* prosecution team learned from [Appellant].

. . . .

Major [JL] was one of the counsel in *United States v. Casillas*. Major [JL] has an interest and reputation for being proficient in digital forensic issues. Petty Officer [IA] interviewed with trial counsel in the case of *United States v. Casillas* multiple times, including on 16/17 September 2022. During those interviews, not prior to, the *Casillas* prosecutors asked Petty Officer First Class [IA] how the application WhatsApp processes images. The prosecutors asked Petty Officer First Class [IA] to look into this. Petty Officer First Class [IA] learned WhatsApp changes the file name when emailed. He discovered that when an image is sent from one WhatsApp account to another WhatsApp account using an iPhone, WhatsApp will assign the image a new naming convention, the hexadecimal. This discovery caused him to change his opinion that Master Sergeant Casillas had access to the applejacks account too. Master Sergeant Casillas sent the image to

[Appellant] via WhatsApp. During that same interview, Major [JL] had many questions related to forensic artifacts to help identify Master Sergeant Casillas as the user of the iPhone XR at or near the date on which the previously discovered cached images of suspected child pornography were found.

The *Casillas* prosecution team again interviewed Petty Officer First Class [sic] in February 2023, just before the case of *United States v. Casillas* started. In the February interview, Petty Officer First Class [IA] discussed the WhatsApp file-naming issue with the *Casillas* prosecution team. Master Sergeant Casillas was court-martialed in February of 2023. Petty Officer First Class [IA] testified in that case.

In his analysis, the military judge concluded:

Here, the defense counsel proffered that the prosecution team in *United States v. Casillas* asked [Appellant] about the photo contained in report item 2 in Prosecution Exhibit 13 specifically, if she received the photo in WhatsApp from Master Sergeant Casillas. Even taken at face value, the Government has met its heavy burden and showing its evidence regarding the photo in Prosecution Exhibit 13. Evidence it proposes to use by way of Petty Officer First Class [IA] as part of the reason he changed his opinion was derived from legitimate and independent source. Indeed, in interviews of [Appellant], the *Casillas* Prosecution team did not learn anything significant that they did not already know from the evidence that was previously discovered during the investigation. The Government was in possession of the evidence well prior to [Appellant]'s interview. So naturally, when together with Petty Officer First Class [sic], Major [JL] had many computer questions of him. This was necessitated by the data as well as Major [JL's] interest in computer forensics. Moreover, Petty Officer First Class [IA] was walled off from all aspects related to anything Major [JL] learned from [Appellant]. Finally, Petty Officer First Class [IA], was never directed to conduct additional searches based off statements of any pretrial interviews to include [Appellant]. The Government did not make direct or indirect use of the immunized statements. Correlation does not equal causation.

The military judge did not analyze whether the prosecutors should be disqualified. He concluded: "Therefore, the Defense objection is overruled and the assigned trial counsel will remain on the case."

After his examination by the district trial counsel resumed in Appellant's case, PO1 IA testified about the photo which changed his opinion.

> Q: And so I guess, did you draw any conclusions from the presence of this picture on a Master Sergeant Casillas's cell phone and the picture within that applejacks account?

> A: Yes, Sir, I did. So when I initially saw the picture on the device and saw that it was visually identical to one I had seen in the email and it led me to have the assumption that there was a possibility that maybe Master Sergeant Casillas might have had access to this account.

> Q: Did that opinion change at some point?

> A: Yes, Sir, it did.

> . . . .

> A: By seeing that the email did not contain that file name, but actually this new, longer hexadecimal stream, it changed my opinion that the user who sent that email did not send it from the gallery, but actually was downloaded from WhatsApp.

> Q: So the user of [applejacks] got this picture on WhatsApp, downloaded it and then forwarded it within this applejacks . . . account?

> A: Yes, sir.

District trial counsel asked PO1 IA: "Based on your expert opinion, who was the sole user of that [applejacks] email account?" After a Defense objection was overruled, PO1 IA opined: "Based on everything that I analyzed everything that I was able to see, I did not see any kind of indication, I did not see any Korean IPs logging into applejacks. I did not, so my belief is most likely that the sole user [of the applejacks email account] was [Appellant]." Before deliberations on finding, the military judge gave the members the following instruction regarding expert testimony:

> You have heard the testimony of Petty Officer First Class [IA]. He is known as an expert witness because of his knowledge, skill, experience, training or education may assist you in understanding the evidence or in determining a fact in issue. You are not required to accept the testimony of an expert witness or give it more weight than the testimony of an ordinary witness. You should, however, consider his qualifications as an expert.

In argument on findings, district trial counsel argued that it was improbable and nonsensical that MSgt Casillas logged into applejacks one time to send

CSAM to his luckymango account. He highlighted PO1 IA's testimony during this portion of his argument. He stated PO1 IA reviewed "upwards of 1000 emails. All of the evidence showing that [Appellant] is logging into that account." He also repeated PO1 IA's opinion: "[Appellant], per the testimony of the digital forensics expert, was the exclusive user of this [applejacks] email account." District trial counsel continued:

> And Defense wants you believe that despite the fact there's no evidence [MSgt Casillas] ever logged into the account he must have just done it this one time. This one time in January when the account was flagged for the child pornography. That's not reasonable. It's not a real possibility. It's not reasonable doubt. It makes zero sense.

District trial counsel repeated these arguments in rebuttal findings argument:

> The digital forensics expert who went through all of the emails and confirmed that the digital forensics match up with your common sense which is that [Appellant] is the exclusive user of this applejacks account.
>
> . . . .
>
> Did Petty Officer [IA] get up on the stand and present as someone who's trying to sell you something? Was he reaching for a certain conclusions? That's not what you saw panel members. You saw someone who is measured, fair. He wasn't reaching. He wasn't speculating. There were logins to both accounts the Applejacks and the luckymango account. That's what the IP data shows there were logins to both accounts. You don't have to go through this convoluted reasoning that makes zero sense from the Defense. The login information shows that [Appellant] was logging into both accounts from Italy. She's logging into luckymango. She's logging into applejacks. [Appellant] is the exclusive user of applejacks, logging into both accounts. That's what the evidence showed. We walked through this at length. The IP shows the pattern of [Appellant] logging into both accounts, that's what accounts for the IP data. Convoluted reasoning as to why Master Sergeant Casillas would log into this account when he's never logged into the account before. No evidence that he's ever logged into the account before, an account he doesn't even have access to, because, [Appellant] changes the password when she's in Italy. And he does all of this, doesn't have access to it, never logged into it before, in order to send himself child pornography. That is some convoluted reasoning we have to get to. But

panel members, you don't need to go through that illogic, that crazy story. You have the emails. Have the expert opinion saying that [Appellant] is the sole user of the account. You have the recordings of her admitting that that's her account. You have those multiple stories from her that makes zero sense and show that she's guilty. Show that consciousness of guilt. Members we have blown way past that pyramid that the Defense put upon the screen. She's guilty beyond all reasonable doubt. Thank you.

**2. Law**

Because the Constitution provides a privilege against self-incrimination, an accused's compelled statements, testimony, and evidence derived therefrom may not be used against the accused. *See United States v. Morrissette*, 70 M.J. 431, 438 (C.A.A.F. 2012); U.S. CONST. amend. V. This protection is afforded to pretrial interview statements or testimony given upon a grant of immunity. *See generally Morrissette*, 70 M.J. at 438.

When challenged at trial, the Government is required to "prove by a preponderance of the evidence that it did not use the immunized testimony against an accused, either directly or indirectly." *United States v. England*, 33 M.J. 37, 39 (C.M.A. 1991) (citing *Kastigar v. United States*, 406 U.S. 441 (1972)). "Both the Supreme Court and [the CAAF] in the military context have interpreted 'use' to include evidentiary and nonevidentiary uses, including the indirect use of testimony to alter the investigative strategy or to inform the decision to prosecute." *Morrissette*, 70 M.J. at 438 (citing *United States v. Mapes*, 59 M.J. 60, 67 (C.A.A.F. 2003)) (additional citations omitted).

"The question of whether the Government has shown, by a preponderance of the evidence, that it has based the accused's prosecution on sources independent of the immunized testimony is a preliminary question of fact." *Mapes*, 59 M.J. at 67 (citation omitted). In determining "whether the Government's evidence against [the a]ppellant was obtained from a source wholly independent of his immunized testimony," the trial judge should consider four factors, as applicable. *Id.* These factors include:

> 1. Did the accused's immunized statement reveal anything "which was not already known to the Government by virtue of [the accused's] own pretrial statement"?
>
> 2. Was the investigation against the accused completed prior to the immunized statement?
>
> 3. Had "the decision to prosecute" [the] accused been made prior to the immunized statement? and,

4. Did the trial counsel who had been exposed to the immunized testimony participate in the prosecution?

*Id.* (first alteration in original) (quoting *England*, 33 M.J. at 38–39). "The grant of immunity must leave the witness and the [G]overnment in 'substantially the same position as if the witness had claimed his privilege in the absence of a [government] grant of immunity.'" *United States v. Vela*, 71 M.J. 283, 289 (C.A.A.F. 2012) (quoting *Kastigar*, 406 U.S. at 457).

Appellate courts review a military judge's ruling relating to the indirect use of immunized statements for an abuse of discretion. *See Morrissette*, 70 M.J. at 434, 442. "We will not overturn a military judge's resolution of this question unless it is clearly erroneous or is unsupported by the evidence." *Vela*, 71 M.J. at 289 (citing *Morrissette*, 70 M.J. at 439). "In reviewing for clear error, we must ask 'whether, on the entire evidence, [we are] left with the definite and firm conviction that a mistake has been committed.'" *Id.* (alteration in original) (quoting *Easley v. Cromartie*, 532 U.S. 234, 242 (2001)).

When an appellate court finds the military judge abused his discretion in allowing the indirect use of immunized statements, the impact of the "tainted" evidence "must be neutralized." *Mapes*, 59 M.J. at 71; *see also Cooke v. Orser*, 12 M.J. 335, 345 (C.M.A. 1982) ("[T]he usual approach adopted by the Supreme Court in fashioning a constitutional remedy is 'to identify' the taint in the criminal proceeding and 'neutralize' it 'by tailoring relief appropriate in the circumstances to assure the defendant' due process of law 'and a fair trial.'" (quoting *United States v. Morrison*, 449 U.S. 361, 365 (1981))). "The remedy in the criminal proceeding [for a constitutional violation] is limited to denying the prosecution the fruits of its transgression." *Morrison*, 449 U.S. at 366. Dismissal of charges is required "where the decision to prosecute was tainted by this evidence." *Mapes*, 59 M.J. at 71. However, charges need not be dismissed with prejudice as a remedy when the Government has evidence "sufficient to sustain a prosecution untainted by the . . . immunized testimony." *Id.* at 72.

"Where constitutional error contributes to a conviction, 'the conviction cannot stand.'" *United States v. Prasad*, 80 M.J. 23, 29 (C.A.A.F. 2020) (citations omitted). "For constitutional errors, rather than the probability that the outcome would have been different, courts must be confident that there was no reasonable possibility that the error might have contributed to the conviction." *United States v. Tovarchavez*, 78 M.J. 458, 462 n.5 (C.A.A.F. 2019) (emphasis omitted) (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)).

**3. Analysis**

Appellant asserts the military judge abused his discretion in his *Kastigar* ruling. Specifically, she asserts the military judge's "findings of fact as to the independent source of the questions to PO1 [IA] are not supported by the

record," and the Government "provided no evidence" and made "no assertions of an independent source." As remedy, Appellant requests Specifications 6 and 7 of Charge I (possession and distribution of child pornography) be dismissed. Even if the military judge abused his discretion, we find dismissal is not an appropriate remedy.

In his ruling, the military judge accepted Appellant's proffer that she told the prosecutors in the *Casillas* case that she received the photo in WhatsApp from MSgt Casillas. This interview with prosecutors occurred after Appellant was immunized, and before those prosecutors asked PO1 IA about different file names associated with one photo. Thereafter, PO1 IA did additional investigating and testing, and changed his opinion about how the photo was sent. He no longer thought it was a real possibility that MSgt Casillas accessed the applejacks account.

The military judge found the evidence leading to this change in opinion "was derived from legitimate and independent source." He does not clearly state the source. Instead, he found the prosecution team learned nothing new of any significance, and they already were in possession of the evidence. The military judge did not make a conclusion about whether the information learned from Appellant "alter[ed] the investigative strategy." *Morrissette*, 70 M.J. at 438.

The primary deficiency in the Government's evidence on the defense motion is failure to establish why Maj JL asked PO1 IA questions about the different file names. The military judge concluded that "naturally" Maj JL had many "computer questions" of PO1 IA and "this was necessitated by the data as well as Maj JL's interest in computer forensics." The Government, in its answer brief, describes the question as "a natural progression in Maj JL's consultation with PO1 IA" in part because of "Maj JL's known penchant and interest in [forensic digital] issues." In his declaration, Maj JL does not state why he asked PO1 IA to explain the different file names, or when he had the idea to ask him.

The military judge dismissed the timing of Appellant's immunized statement and Maj JL's questions to PO1 IA as correlation and not causation. However, the Government had the burden—it needed to demonstrate lack of causation. The Government did not prove by a preponderance of evidence that Maj JL asked about the different file names based on something other than getting the idea from Appellant's immunized interview statements. We see speculation, not evidence, that Maj JL eventually would have come up with the idea—without having interviewed Appellant—based on his keen interest in digital forensics and his review of the evidence, including PO1 IA's report. The military judge abused his discretion in relying on this speculation to find the Government met its "'heavy burden' to show non-use" of Appellant's

immunized statements. *United States v. Youngman*, 48 M.J. 123, 127 (C.A.A.F. 1998) (quoting *Kastigar*, 406 U.S. at 461) (quoted in *Mapes*, 59 M.J. at 68).

Additionally, Appellant asserts the "prosecutors in [Appellant's] case were tainted by their exposure to PO1 IA's testimony in *Casillas* because that testimony was indirectly influenced by [Appellant's] immunized statements." Appellant's counsel continues: "The military judge abused his discretion in allowing the trial counsel to remain in place after listening to PO1 IA's testimony from the *Casillas* court-martial and in allowing PO1 IA to testify to the information he discovered after the prosecutors interviewed [Appellant] during the *Casillas* court-martial." As remedy, Appellant requests we set aside the findings and sentence in Appellant's case and order a rehearing with conflict-free counsel. Because the military judge did not explain his analysis, we consider this issue de novo and find no relief is warranted. While we find PO1 IA was exposed indirectly to Appellant's immunized statement, we do not find the trial counsel in Appellant's case were tainted.

Appellant asks that, "[i]f the [c]ourt disagrees that the Government counsel were tainted," we set aside the child pornography guilty findings (Specifications 6 and 7 of Charge I). We find that remedy inappropriate in this case. The derivative use of immunized statements did not affect the charging decisions in Appellant's case.

That "taint" in this case does not involve discovery of new evidence. The Government already knew Appellant and MSgt Casillas communicated via WhatsApp, and that some emails were sent from applejacks to applejacks. PO1 IA saw the same image on MSgt Casillas's phone and in an applejacks email and made an assumption—that one time MSgt Casillas may have used applejacks. The "taint" here may have caused PO1 IA to look more critically at the evidence already before him and disregard his earlier assumption.

The members were instructed that PO1 IA's testimony "may assist [them] in understanding the evidence or in determining a fact in issue" and that they "are not required to accept the testimony of an expert witness or give it more weight than the testimony of an ordinary witness." We recognize that the opinion of an expert witness often is given substantial weight. In this case, however, the Government's expert had come to a conclusion which was based less on specialized knowledge and more on circumstantial evidence. Indeed, in this case the evidence was overwhelming that Appellant and only Appellant accessed applejacks around the time the child pornography was attached to emails and sent to luckymango. *See* Section II.D.3.e, *infra*. In this case, we are "confident that there was no reasonable possibility that the error might have contributed to the conviction." *Tovarchavez*, 78 M.J. at 462 n.5. We find unreasonable the probability the factfinder would not be convinced by the evidence

alone and rely on PO1 IA's opinion about who used applejacks. No relief is warranted.

## D. Legal and Factual Sufficiency

### 1. Standards of Review

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). "Our assessment of legal and factual sufficiency is limited to the evidence produced at trial." *United States v. Rodela*, 82 M.J. 521, 525 (A.F. Ct. Crim. App. 2021) (citation omitted), *rev. denied*, 82 M.J. 312 (C.A.A.F. 2022).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (citation omitted). "[T]he term 'reasonable doubt' does not mean that the evidence must be free from any conflict . . . ." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (citation omitted). In resolving questions of legal sufficiency, we are "bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Bright*, 66 M.J. 359, 365 (C.A.A.F. 2008) (internal quotation marks and citation omitted). The evidence supporting a conviction can be direct or circumstantial. *See United States v. Long*, 81 M.J. 362, 368 (C.A.A.F. 2021) (citing R.C.M. 918(c)) (additional citation omitted). "[A] rational factfinder[ ] could use his 'experience with people and events in weighing the probabilities' to infer beyond a reasonable doubt" that an element was proven. *Id.* at 369 (quoting *Holland v. United States*, 348 U.S. 121, 140 (1954)). The "standard for legal sufficiency involves a very low threshold to sustain a conviction." *King*, 78 M.J. at 221 (internal quotation marks and citation omitted).

For this case, "[t]he test for factual sufficiency is 'whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt.'" *Rodela*, 82 M.J. at 525 (second alteration in original) (quoting *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987)). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (alteration in original) (quoting *Washington*, 57 M.J. at 399), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018).

### 2. Additional Law and Analysis

#### a. Extramarital Sexual Conduct

Appellant claims Specification 1 of Charge I—extramarital sexual conduct with MSgt Casillas—is neither factually nor legally sufficient. She argues the evidence does not prove they engaged in "'genital to genital' sexual intercourse" with each other as charged during the charged timeframe—between on or about 1 May 2019 and on or about 15 January 2020. Appellant also argues the Government did not prove the alleged conduct to be service discrediting.

To convict Appellant of extramarital sexual conduct, the Government was required to prove the following elements beyond a reasonable doubt: that (1) Appellant wrongfully engaged in extramarital conduct with a certain person, (2) at the time, Appellant knew that certain person was married to someone else, and (3) under the circumstances, Appellant's conduct was of a nature to bring discredit upon the armed forces. *See Manual for Courts-Martial, United States* (2019 ed.) (*MCM*), pt. IV, ¶ 99.b.(1)–(3). "'Discredit' means to injure the reputation of the armed forces and includes extramarital conduct that has a tendency, because of its open or notorious nature, to bring the Service into disrepute, make it subject to public ridicule, or lower it in public esteem." *MCM*, pt. IV, ¶ 99.c.(1). Relevant to the offense charged, prohibited conduct includes sexual intercourse that is genital to genital. *MCM*, pt. IV, ¶ 99.c.(2)(a).

The primary evidence of their sexual relationship comes from emails they sent using accounts they created on 16 May 2019 during their time together in Virginia. The Government also introduced evidence indicating Appellant and MSgt Casillas were physically together for several days in two locations shortly *before* the charged time period beginning on or about 1 May 2019: Thailand from 11 to 30 January 2019 and Korea from 27 March to 7 April 2019.[11]

In support of its contention that the record includes evidence of genital-to-genital contact, the Government notes the following: a photo of Appellant's bruised buttocks and another photo of the two in bed together with no clothes visible; a video of MSgt Casillas pleasuring himself with his anus; references to having sex "like pornstars 'every time,'" to curling up together sleeping, and

---

[11] The specification alleged that Appellant wrongfully engaged in extramarital sexual conduct "at worldwide locations, on divers occasions, between on or about 1 May 2019 and on or about 15 January 2020." While discussing findings instructions, trial counsel informed the Defense and the military judge that the Government intended to argue that Appellant's interactions with MSgt Casillas in April 2019 were "on or about" 1 May 2019 as charged. Even so, the military judge provided the members a standard variance instruction and provided them a findings worksheet where they easily could except the phrase "1 May 2019" and substitute therefor the phrase "1 April 2019." The members found Appellant guilty as charged.

to wanting to have sex together; and describing her visit to Thailand in January 2019 with MSgt Casillas as a "honeymoon." The Government then claims, "As shown, the panel received ample evidence that genital to genital sexual intercourse took place on divers occasions during the charged timeframe." The Government does not argue variance in the type of sexual intercourse charged.

While we find convincing circumstantial evidence that Appellant and MSgt Casillas engaged in sexual intercourse in April and May of 2019, we are not convinced beyond a reasonable doubt that they engaged in *genital-to-genital* sexual contact during this time. The Government narrowed the scope of this specification to only genital-to-genital contact, and had the burden to present evidence to support that level of detail. Therefore, the finding of guilty to Specification 1 of Charge I is not factually sufficient; we address this conclusion in our decretal paragraph. As such, we need not determine whether the finding is legally sufficient.

### b. Indecent Language

Appellant claims Specification 2 of Charge I—indecent language—is not factually sufficient because the speech is protected by the liberty interest articulated in *Lawrence v. Texas*, 539 U.S. 558 (2003). We disagree.

To convict Appellant of indecent language, the Government was required to prove the following elements beyond a reasonable doubt: that (1) Appellant in writing communicated to another person certain language, (2) such language was indecent, and (3) under the circumstances, Appellant's conduct was of a nature to bring discredit upon the armed forces. *See MCM*, pt. IV, ¶ 104.b.(1)–(3).

"In *Lawrence*, the focal point of the constitutional protection involved an act of sexual intimacy between two individuals in a wholly private setting without more. *Lawrence* did not establish a presumptive constitutional protection for all offenses arising in the context of sexual activity." *United States v. Goings*, 72 M.J. 202, 206 (C.A.A.F. 2013) (first citing *Lawrence*, 539 U.S. at 562–63; then citing *Lawrence*, 539 U.S. at 578) (additional citations omitted). The Supreme Court concluded that certain factors limit a person's liberty and privacy interest in consensual sexual activity in other cases. Specifically, the Court observed: "The present case does not involve minors. It does not involve persons who might be injured or coerced or who are situated in relationships where consent might not easily be refused. It does not involve public conduct or prostitution." *Lawrence*, 539 U.S. at 578.

In *United States v. Meakin*, the CAAF "reject[ed the a]ppellant's argument that distributing or transmitting obscenity that encourages, describes, and revels in the sexual exploitation of children over the internet falls within the fundamental liberty interest recognized in *Lawrence*." 78 M.J. 396, 403 (C.A.A.F.

2019). We found this holding in *Meakin* applies "even if the receiver is believed to be a willing adult recipient of the communication." *United States v. McDaniel*, 80 M.J. 555, 558–59 (A.F. Ct. Crim. App. 2020) (citation omitted), *rev. denied*, 80 M.J. 365 (C.A.A.F. 2020). The CAAF found the speech in *Meakin* "conveyed patently offensive, repugnant sexual fantasies involving children . . . that appealed, and was intended to appeal, to the prurient interest" and that "[s]uch speech is not protected by the First Amendment[12]." 78 M.J. 401 (internal quotation marks omitted).

On 16 November 2019, Appellant emailed to MSgt Casillas screenshots of the following half-hour WhatsApp conversation.

> [Appellant:] Let's run away and get married. And when we hire babysitters for the littles…we can come home and you can f[**]k her for payment
>
> . . . .
>
> [MSgt Casillas:] [replying to Appellant's last statement] On[e] rule no one over 16
>
> [Appellant:] Done
>
> [MSgt Casillas:] I think you meant to say rape her for payment
>
> [Appellant:] I absolutely did
>
> [MSgt Casillas:] [attaching pornhub.com link]
>
> [MSgt Casillas:] Or we come home and find her doing this
>
> [MSgt Casillas:] Or we come home and find her asleep on the couch.
>
> [Appellant:] [replying to MSgt Casillas's last statement] This.
>
> [MSgt Casillas:] The neighbor's daughter…she's 12.
>
> [MSgt Casillas:] Go
>
> [MSgt Casillas:] [attaching different pornhub.com link]
>
> [MSgt Casillas:] Here's your hairbrush
>
> [Appellant:] Lol. Yeah but there was something about her over my lap, f[**]king her ass, her crying, and spanking her
>
> [MSgt Casillas:] Yeah your right

---

[12] U.S. CONST. amend. I.

[MSgt Casillas:] [replying to Appellant's last statement] I'd love to watch this

[Appellant:] I WANT TO DO THIS

. . . .

[Appellant:] We will take her on a family vacation with us to be the evening babysitter… When we come back in the evening and she's asleep we will drug her so she doesn't remember and [d]o whatever the f[**]k we want to her. She will Have fun with all of us during the day… Each next day… Not realizing why she is so sore… And what the f[**]k is happening to her every night.

. . . .

[MSgt Casillas:] Mmmmm let's make her our little f[**]k toy

[Appellant:] Yes!

. . . .

[MSgt Casillas:] Tell me you want to finger f[**]k her 12yo p[**]sy!

[Appellant:] [replying to MSgt Casillas's last statement] F[**]k yes I want to finger f[**]k her 12 yo p[**]sy

. . . .

[Appellant:] Baby are you going to f[**]k her 12yo p[**]sy while you suck on her toes and I put my pretty red painted toes in your a[**][.]

MSgt Casillas was sexually gratified by this conversation, as he indicates in other portions not quoted above.

Appellant does not attempt to distinguish her case from *Meakin*, either factually or legally. We have considered differences between Appellant's case and *Meakin*, and find they do not dissuade us from applying the CAAF's holding here. Appellant's written communications to MSgt Casillas detailing sexual fantasies involving children do not receive First Amendment protection. After weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt. We find Specification 2 of Charge I—indecent language—is factually sufficient.

### c. Indecent Conduct and Sexual Abuse of a Child

Appellant claims Specification 3 of Charge I—indecent conduct by recording and transmitting the recording of herself masturbating "in front of" a

34

child—is not factually sufficient because, as charged, the offense required the child's awareness of the conduct. For a similar reason, Appellant claims the Specification of Charge II—sexual abuse of a child—is not legally sufficient. She requests we reconsider our holding in *United States v. Cabuhat*, 83 M.J. 755, 769 (A.F. Ct. Crim. App. 2023) (en banc), *rev. den'd*, 84 M.J. 275 (C.A.A.F. 2024), where we found the child's awareness was not required for a conviction under Article 120b(c), UCMJ, 10 U.S.C. § 920b(c).

To convict Appellant of indecent conduct, the Government was required to prove the following elements beyond a reasonable doubt: that (1) Appellant engaged in certain conduct, (2) the conduct was indecent, and (3) under the circumstances, Appellant's conduct was of a nature to bring discredit upon the armed forces. *See MCM*, pt. IV, ¶ 104.b.(1)–(3).

To convict Appellant of sexual abuse of a child, the Government was required to prove beyond a reasonable doubt that Appellant committed a lewd act upon a child. *See* 10 U.S.C. § 920b(c); *MCM*, pt. IV, ¶ 62.b.(3). Relevant to the charged offense in this case, the term "lewd act" means "any indecent conduct, intentionally done with or in the presence of a child . . . that amounts to a form of immorality relating to sexual impurity which is grossly vulgar, obscene, and repugnant to common propriety, and tends to excite sexual desire or deprave morals with respect to sexual relations." 10 U.S.C. § 920b(h)(5)(D); *MCM*, pt. IV, ¶ 62.a.(h)(5)(D). This court concluded that "'in the presence' . . . *does not* require an 'awareness' of the child victim of the accused's lewd acts." *Cabuhat*, 83 M.J. at 769.

On 5 June 2019, Appellant emailed to MSgt Casillas a 20-second video recording with the subject line "Wet and not alone." The recording begins with a left hand, moving as if masturbating, then stopping to show left-hand fingers. After this sequence is repeated, the camera pans up to show Appellant's daughter sitting across the table, looking at a tablet or similar electronic device. The child appears to be unaware of Appellant's actions. The person recording herself is also seated at the table. In subsequent emails relating to the recording, Appellant and MSgt Casillas expressed to each other that they felt compelled to watch it repeatedly, apparently because it fueled their sexual desires.

We reject Appellant's arguments regarding "in front of" and "awareness." First, we find that "masturbating in front of a child"—as used in the indecent conduct specification—does not mean both in the child's presence and with her awareness. The recording shows Appellant was directly in front of her child seated at the other side of the table and facing her. Next, we decline Appellant's suggestion to break from our holding in *Cabuhat*; we apply that holding—that awareness by the child is not required—to both specifications.

35

After weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt. We find Specification 3 of Charge I—indecent conduct by recording and transmitting the recording of herself masturbating "in front of" a child—and Specification of Charge II—sexual abuse of a child—are factually sufficient.

### d. Service-Discrediting Conduct

Appellant claims Specification 4 of Charge I—defecating on the floor of a military facility and recording herself doing so—is not factually sufficient because the evidence does not prove the conduct was of a nature to bring discredit upon the armed forces. We agree.

To convict Appellant of this offense, the Government was required to prove the following elements beyond a reasonable doubt: that (1) Appellant did a certain act, and (2) under the circumstances, Appellant's conduct was of a nature to bring discredit upon the armed forces. *See* 10 U.S.C. § 934; *MCM*, pt. IV, ¶ 91.b.(2)(a)–(b). "'Discredit' means to injure the reputation of." *MCM*, pt. IV, ¶ 91.c.(3). "Whether conduct is of a 'nature' to bring discredit upon the armed forces is a question that depends on the facts and circumstances of the conduct, which includes facts regarding the setting as well as the extent to which Appellant's conduct is known to others." *United States v. Phillips*, 70 M.J. 161, 166 (C.A.A.F. 2011).

In *Heppermann*, our court addressed service-discrediting conduct as the terminal element:

> "[T]he degree to which others became aware of the accused's conduct may bear upon whether the conduct is service discrediting," but actual public knowledge is not a prerequisite. "The trier of fact must determine beyond a reasonable doubt that the conduct alleged actually occurred and must also evaluate the nature of the conduct and determine beyond a reasonable doubt that [the appellant]'s conduct would tend to bring the service into disrepute if it were known."

82 M.J. 794, 801 (A.F. Ct. Crim. App. 2022) (alteration in original) (quoting *Phillips*, 70 M.J. at 165–66); *see also United States v. Wells*, 85 M.J. 154, 157–159 (C.A.A.F. 2024) (upholding *Phillips*).

On 17 July 2019, Appellant emailed herself two video recordings. The first recording in evidence is about 1 minute and 22 seconds long. The recording is from a camera at ground level facing Appellant's backside. Her face is not visible and she does not appear to be wearing a military uniform. She is in a squatting position and naked from the waist to the shoes except for shorts pulled down to her knees. The recording shows Appellant urinating on the tile

floor. After a time, she says "it's not coming out," stands up briefly, defecates a small amount, then squats again. In a second recording, showing the urine and feces on the tile floor, Appellant says, "So much work for such little return." At trial, SA AQ testified the bathroom in the videos was in the squadron building where Appellant works. He identified the female voice as Appellant. The evidence suggests the person cleaned up the mess before anyone could discover it, and no one—except perhaps MSgt Casillas—knew about her actions until investigators searched through the emails. No evidence was presented about whether other personnel were in the vicinity of the bathroom at the time of the recording or whether any doors to the bathroom were locked.

Appellant argues that while the act of defecating in a military facility may have been "distasteful, the circumstances were not such that a member of the public would think less of the armed forces[, p]rimarily because no member of the public was ever aware that it occurred." We agree in part. While lack of public awareness may be a factor to consider, we reject the argument that this factor weighs heavily in Appellant's favor. Additionally, Appellant asks us to "consider the private and secretive nature" of the transmission of the recording, and we have.

The Government responds,

> [T]here is sufficient evidence for a rational finder of fact to determine that someone who set up a camera in an Air Force base facility, pulled down their pants, specifically positioned their rear end to be centered on the camera's shot, and then defecated on the floor of that Air Force base facility while filming it, had engaged in conduct that might tend to discredit the service *if the public were to know about it*.

We have considered "the facts and circumstances of the conduct, which includes facts regarding the setting as well as the extent to which Appellant's conduct is known to others." *Phillips*, 70 M.J. at 166. Based on the evidence presented in this case relating to this offense, we conclude Appellant's conduct, while discrediting to Appellant, was not such that it would tend to "bring the *service* into disrepute or lower it in public esteem." *MCM*, pt. IV, ¶ 91.c.(3) (emphasis added). The stature of the armed forces was not so fragile that it would be shaken by Appellant's distasteful yet benign and isolated conduct. Our conclusion should not be interpreted as holding that conduct like Appellant's cannot be service discrediting. We took "a fresh, impartial look at the evidence" in this case and determined the service-discrediting element was not met. *Washington*, 57 M.J. at 399. We find Specification 4 of Charge I—defecating on the

floor of a military facility and recording herself doing so—is not factually sufficient.[13] We address that conclusion in our decretal paragraph.

### e. Child Pornography

Appellant claims Specifications 6 and 7 of Charge I—possessing and distributing child pornography—are not factually sufficient because the Government failed to prove Appellant "was operating the 'applejacks' email account when it was used to send the material to the 'luckymango' account;" evidence showed Appellant was the primary user but not the sole user of the account; and it is "a real possibility . . . that MSgt Casillas used the 'applejacks' account to send the charged images." In considering this issue, we have disregarded PO1 IA's opinion that Appellant was the sole user of applejacks. *See* Section II.C.3 *supra*.

To convict Appellant of the child pornography offenses, the Government was required to prove the following elements beyond a reasonable doubt: that (1) Appellant knowingly and wrongfully possessed (Specification 6) / distributed (Specification 7) child pornography and (2) under the circumstances, Appellant's conduct was of a nature to bring discredit upon the armed forces. *See MCM*, pt. IV, ¶¶ 95.b.(1)(a)–(b), (3)(a)–(b). Specifications 6 and 7 of Charge I both described the charged child pornography as "digital images of minors, or what appears to be minors, engaging in sexually explicit conduct."

A review of the emails in evidence indicates that Appellant accessed applejacks exclusively. She used her first name, sent selfies, and sent screenshots of her WhatsApp conversations. No emails appeared to be authored by anyone else. Moreover, a couple months after the accounts were created, the password to applejacks and only applejacks was changed.

Several events happened in relatively short succession indicating Appellant was using applejacks when the child pornography was sent and knew that having and sending it was wrongful. On 7 January 2020, applejacks sent an email to luckymango: "It's 0430 my time and you still aren't on WhatsApp….I have been checking all night." Several hours later, around 1115 hours in Appellant's location, applejacks sent an email to luckymango: "Hey baby[.] I didn't realize I was going to miss you for the day. I wish you would have messaged me and let me know. Anyways I hope you have a good day[.] Love you." Less

---

[13] We also question whether Appellant was on notice that the charged conduct was criminal, as no words of criminality were alleged beyond the terminal element. *See United States v. Shafran*, __ M.J. __, No. 24-0134, slip op. at *6 (C.A.A.F. 12 May 2025) (restating holding in *United States v. Vaughan*, 58 M.J. 29 (C.A.A.F. 2003), that "an unenumerated Article 134, UCMJ, specification must allege unlawful or wrongful conduct").

than three hours later—after 1330 hours in Appellant's location—11 emails each containing images of CSAM were sent from applejacks to luckymango over the course of six minutes. About four hours later, an email sent from applejacks to applejacks contained several screenshot images of a WhatsApp conversation Appellant had with MSgt Casillas. The email was titled "Running away convo" and the messages comprise an argument between Appellant and MSgt Casillas about when they would be together indefinitely. About nine hours later, Appellant called the ESP to complain that she could no longer access applejacks. Appellant estimated she last accessed applejacks six to eight hours before. She hung up before her complaint could be resolved. About half a day later, Appellant twice called the ESP. She asserted her account was hacked and was used to send "porn." She begged for applejacks to be deleted.

After weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt.

### E. Unreasonable Multiplication of Charges

Appellant asserts the indecent conduct offense (Specification 3 of Charge I) and the sexual abuse of a child offense (Charge II and its Specification) were an unreasonable multiplication of charges. Similarly, Appellant asserts the possession and distribution of child pornography offenses (Specifications 6 and 7 of Charge I) were an unreasonable multiplication of charges. We find no relief is warranted.

#### a. Additional Background

At trial, Appellant moved to dismiss Specification 3 of Charge I and Charge II and its Specification "or one of them" "on the basis of multiplicity and unreasonable multiplication of charges." If denied, Appellant requested merger of those specifications for sentencing. Appellant did not move for any similar relief relating to Specifications 6 and 7 of Charge I.

During the hearing on this motion, the Defense referenced and distinguished Specifications 6 and 7, stating, *inter alia*, "the possessing and distributing of the same image [of child pornography] is not multiplicity [ ] because it is very clear through congressional intent and case law that those two acts are very different because of the materials at issue."

The military judge denied the motion to dismiss and granted the request to merge the specifications for sentencing. In finding the specifications were not multiplicious, the military judge found "the alleged misconduct arguably arises out of the same act. However, Specification 3 of Charge I requires the Government to show [Appellant] transmitted the recording to MSgt Casillas."

This distinction between recording and transmitting also factored prominently into the military judge's analysis of unreasonable multiplication of offenses for findings. The military judge concluded:

> The specification of Charge II and Specification 3 of Charge I allege distinctly separate criminal acts undertaken with distinct criminal compulsions. The separate specifications do not misrepresent or exaggerate [Appellant's] criminality but highlight the specific criminal acts as they occurred. As such, there is no unreasonable increase to [Appellant's] punitive exposure, and no evidence of prosecutorial overreaching or abuse in the drafting of the charges.

For the merged specifications, the military judge sentenced Appellant to 32 months' confinement. For Specifications 6 and 7 of Charge I, the military judge sentenced Appellant to 24 and 28 months, respectively, of confinement. The military judge announced that all periods of confinement would run concurrently.

### b. Law

Rule for Courts-Martial 307(c)(4) advises: "What is substantially one transaction should not be made the basis for an unreasonable multiplication of charges against one person." *See also* R.C.M. 906(b)(12)(A) ("Charges that arise from substantially the same transaction, while not legally multiplicious, may still be unreasonably multiplied as applied to findings."). The Government may not needlessly "pile on" charges against an accused. *United States v. Foster*, 40 M.J. 140, 144 n.4 (C.M.A. 1994), *overruled on other grounds by United States v. Miller*, 67 M.J. 385, 388–89 (C.A.A.F. 2009).

A claim of unreasonable multiplication of charges may be waived. *See United States v. Hardy*, 77 M.J. 438, 442–43 (C.A.A.F. 2018); *United States v. Gladue*, 67 M.J. 311, 314 (C.A.A.F. 2009).

We review a military judge's denial of relief for claims of unreasonable multiplication of charges for an abuse of discretion. *United States v. Campbell*, 71 M.J. 19, 22 (C.A.A.F. 2012) (citations omitted). "An abuse of discretion occurs when a military judge's decision is based on clearly erroneous findings of fact or incorrect conclusions of law." *Hernandez*, 81 M.J. at 437 (citation omitted).

A military judge considers the following non-exhaustive list of factors when analyzing unreasonable multiplication of charges: (1) whether each charge and specification is aimed at distinctly separate criminal acts; (2) whether the number of charges and specifications misrepresents or exaggerates the accused's criminality; (3) whether the number of charges and specifications unreasonably increases the accused's punitive exposure; and (4) whether there is any evidence of prosecutorial overreaching or abuse in the drafting of the charge.

*Campbell*, 71 M.J. at 24 (citing *United States v. Quiroz*, 55 M.J. 334, 338–39 (C.A.A.F. 2001)). Additionally, appellate courts consider (5) whether the appellant objected at trial or forfeited the issue. *See United States v. Pauling*, 60 M.J. 91, 95 (C.A.A.F. 2004) (citation omitted).

The *Quiroz* "factors are not 'all-inclusive.' . . . Nor is any one or more factors a prerequisite." *Campbell*, 71 M.J. at 23 (quoting *Quiroz*, 55 M.J. at 338–39). "Likewise, one or more factors may be sufficiently compelling, without more, to warrant relief on unreasonable multiplication of charges based on prosecutorial overreaching." *Id.* (citation omitted). "Ultimately, with respect to both the findings and the sentence, 'the application of the *Quiroz* factors involves a reasonableness determination . . . and is a matter well within the discretion of [a Court of Criminal Appeals] in the exercise of its Article 66[ ] . . . powers.'" *United States v. Forrester*, 76 M.J. 479, 484 (C.A.A.F. 2017) (omissions in original) (quoting *United States v. Anderson*, 68 M.J. 378, 386 (C.A.A.F. 2010)).

Remedies for unreasonable multiplication of charges include merger and dismissal. *See Campbell*, 71 M.J. at 22–23 (citation omitted); s*ee also* R.C.M. 906(b)(12)(A) ("When the military judge finds . . . the offenses have been unreasonably multiplied [as applied to findings], the appropriate remedy shall be dismissal of the lesser offenses or merger of the offenses into one specification.").

### c. Analysis

We begin with Appellant's claims that Specification 3 of Charge I and Charge II and its Specification are an unreasonable multiplication of charges for findings. Appellant does not identify any erroneous finding of fact or misunderstanding of the law by the military judge. Appellant suggests we review this issue de novo or under a plain-error standard, stating, "In first examining Specification 3 of Charge I and the Specification of Charge II under the *Quiroz* factors, it is clear that guilty findings to both of these specifications create an unreasonable multiplication of charges." Applying the standard of abuse of discretion, we find the military judge did not err in his findings of fact or conclusions of law and, therefore, do not disturb his ruling regarding Specification 3 of Charge I and Charge II and its Specification.

Next, we turn to Appellant's claim that Specifications 6 and 7 of Charge I are an unreasonable multiplication of charges. First, we find waiver. At trial, Appellant raised the issue of unreasonable multiplication of charges to other offenses. During the hearing on that motion, the Defense specifically mentioned Specifications 6 and 7 of Charge I did not involve "multiplicity."

Next, assuming instead Appellant forfeited this issue, we agree with Appellant that we review for plain error. *See Gladue*, 67 M.J. at 313 (citation omitted). Essentially, Appellant asserts it was plain error for the military

judge to not dismiss Specification 6 of Charge I *sua sponte*. Appellant relies on *United States v. Williams*, 74 M.J. 572 (A.F. Ct. Crim. App. 2014), to support her argument that the *Quiroz* factors weigh heavily in her favor. The appellant in *Williams* downloaded child pornography through a peer-to-peer file sharing program, then was alleged to have distributed the images by allowing them to "reside" in a shared folder without restricting access to others. *Id.* at 575. Our court noted "[t]he Government did not demonstrate that the appellant took any further affirmative steps to possess the material (such as transferring the files to other media devices or moving them to other locations on his hard drive) or to distribute the material after he received the images." *Id.* at 575–76.

Appellant's case is easily distinguishable from *Williams*. Appellant did not merely possess images for others to download. She drafted an email, gave it a subject name beginning "Young girls," attached three or four images of CSAM in her possession, and sent it to luckymango. She repeated this action ten times. Many of the images were obvious child pornography.

We have reviewed the record and considered the *Quiroz* factors. We note one factor weighs heavily against Appellant—that she did not raise the issue at trial. We considered that, while the specifications were not merged for sentencing, the periods of confinement run concurrently and are eclipsed by the period of confinement imposed for the Specification of Charge II. We find no plain error and conclude no relief is warranted.

## F. Sentence Reassessment

### 1. Law

When a finding of guilty is set aside, this court may authorize a rehearing on sentence or if we can, we may reassess the sentence. *United States v. Doss*, 57 M.J. 182, 185 (C.A.A.F. 2002) (citation omitted).

We have broad discretion first to decide whether to reassess a sentence, and then to arrive at a reassessed sentence. *United States v. Winckelmann*, 73 M.J. 11, 13 (C.A.A.F. 2013) (citing *United States v. Sales*, 22 M.J. 305 (C.M.A. 1986)). In deciding whether to reassess a sentence or return a case for a rehearing, we consider the totality of the circumstances including the following factors: (1) "Dramatic changes in the penalty landscape and exposure;" (2) "Whether an appellant chose sentencing by members or a military judge alone;" (3) "Whether the nature of the remaining offenses capture[s] the gravamen of criminal conduct included within the original offenses and . . . whether significant or aggravating circumstances addressed at the court-martial remain admissible and relevant to the remaining offenses;" and (4) "Whether the remaining offenses are of the type that judges of the courts of criminal appeals should have the experience and familiarity with to reliably

determine what sentence would have been imposed at trial." *Id.* at 15–16 (citations omitted).

If we cannot determine that the sentence "would have been at least of a certain magnitude," we must order a rehearing. *United States v. Harris*, 53 M.J. 86, 88 (C.A.A.F. 2000) (citation omitted).

### 2. Analysis

Application of the *Winckelmann* factors convinces us that we can reassess the sentence. Appellant requested to be sentenced by a military judge alone. Specifications 1 and 4 of Charge I were the least serious offenses. The military judge's segmented sentences to confinement reflect this: for each, he sentenced Appellant to two months' confinement. These periods are dwarfed by the remaining periods of confinement: 6 months (the maximum) for indecent language, 24 months for possession of child pornography, 28 months for distribution of child pornography, and 32 months for both sexual abuse of a child and indecent conduct. All periods of confinement ran concurrently. Setting aside Specifications 1 and 4 of Charge I does not change the penalty landscape dramatically. The gravamen of the criminal conduct at issue was sexual matters relating to children, not her affair or distasteful video.

Finally, the remaining offenses are the type that we have extensive experience and familiarity with to reliably determine what sentence would have been imposed at trial. Considering all these factors, we are confident that without the set-aside findings, Appellant's sentence still would have included at least a term of confinement for 32 months (in the same segmented fashion the military judge set forth beyond the set-aside offenses), reduction to the grade of E-1, and a dishonorable discharge. We therefore reassess the sentence to reflect that sentence and disapprove the adjudged reprimand.

### III. CONCLUSION

The findings of guilty for Specification 1 and Specification 4 of Charge I are **SET ASIDE**. Specification 1 and Specification 4 of Charge I are **DISMISSED WITH PREJUDICE**. We affirm the remaining findings of guilty, and affirm only so much of the sentence as provides for confinement for 32 months, reduction to the grade of E-1, and a dishonorable discharge, maintaining the same segments as listed by the military judge for the remaining specifications. The remaining findings of guilty and the sentence, as reassessed, are correct in law and fact, and no additional error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d).

Accordingly, the remaining findings and sentence, as reassessed, are **AF-FIRMED.**



FOR THE COURT

CAROL K. JOYCE
Clerk of the Court